# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
### AT CHATTANOOGA

SHARA CLAYBROOK )
    *Plaintiff*, )
)     Case No. 1:18-cv-00029-TAV-CHS
v. )
)
SUNOCO GP LLC, )
M. KATE FITZPATRICK, and )
CHERYL A. SMITH )
    *Defendants*. )

## REPORT AND RECOMMENDATION

## I.     Introduction

This matter is before the Court upon Defendants' Motion to Vacate Arbitration Award[1] [Doc. 34] and Plaintiff Shara Claybrook's ("Plaintiff" or "Claybrook") Motion to Confirm Arbitration Award and Award Interest [Doc. 45]. By way of background, these motions follow entry of an arbitration award in favor of Plaintiff against Defendants Sunoco GP, LLC ("Sunoco"), M. Kate Fitzpatrick ("Fitzpatrick"), and Cheryl A. Smith ("Smith"), with respect to Plaintiff's claims of defamation and tortious interference with a business relationship. In their competing motions, Defendants seek to have the arbitration award set aside, while Plaintiff asks the Court to confirm the award.

These motions are before the Court having been referred for a report and recommendation by the District Court pursuant to 28 U.S.C. § 636(b)(1)(B) and (C). The Court has subject matter jurisdiction to hear these motions pursuant to 28 U.S.C. § 1332. For the reasons stated herein, the

---

[1] On August 18, 2021, Defendants moved to supplement their Motion to Vacate or Modify the Arbitration Award to clarify the basis for this Court's subject matter jurisdiction. [Doc. 38]. The Court granted the motion the following day. [Doc. 42]. The Motion to Vacate or Modify, as supplemented [*see* Supplement, Doc. 38-1], establishes that there is complete diversity of citizenship between the parties and that the amount in controversy is over $75,000.

1

Court **WILL RECOMMEND** that Defendants' Motion to Vacate Arbitration Award [Doc. 34] be **DENIED**; Plaintiff's Motion to Confirm Arbitration Award and Award Interest [Doc. 45] be **GRANTED**; the Arbitrator's award be **CONFIRMED** pursuant to the Federal Arbitration Act, 9 U.S.C. § 9; and Plaintiff be **AWARDED** post-award, prejudgment interest and post-judgment interest.

## II.    Background

### A.    Procedural History

On February 2, 2018, Plaintiff filed an action in this Court asserting claims against Sunoco and former Sunoco employees, Fitzpatrick and Smith, arising from Plaintiff's employment with Sunoco. On August 17, 2018, Sunoco filed a motion to dismiss and compel arbitration of Plaintiff's lawsuit. On October 4, 2018, the parties entered a stipulation of dismissal without prejudice in this Court pursuant to Federal Rule of Civil Procedure 41, so that the case could be submitted to arbitration.

In November 2018, the American Arbitration Association ("AAA") opened a case to arbitrate Plaintiff's claims against Defendants and appointed as the arbitrator, Matthew Sweeny, a shareholder at Baker, Donelson, Bearman, Caldwell & Berkowitz, PC, and a former Davidson County Circuit Court judge. Neither side objected to Arbitrator Sweeney's appointment. [Doc. 45-1, Ex. 1 to Pl.'s Response to Def.s' Motion to Vacate, Page ID # 868][2].

Plaintiff asserted four claims against Sunoco in the arbitration: (1) a violation of the Fair Labor Standards Act ("FLSA"); (2) a violation of the Family and Medical Leave Act ("FMLA");

---

[2] "Page ID # __" is a reference to the page identification number assigned to every page of every document filed in the Court's electronic record. Page numbers continue in sequential order from document to document. The Page ID # is found on the bottom of each page filed in the electronic record.

(3) defamation; and (4) tortious interference with a business relationship. Plaintiff also asserted the two tort claims against Fitzpatrick and Smith.

By way of factual background, Plaintiff was employed as a field recruiter for Sunoco from December 2015 to October 2017. According to Plaintiff, shortly before Sunoco sold the division where she worked to 7-Eleven, she was given a verbal job offer by Axalta Coatings Systems, Ltd ("Axalta"). The job offer involved better pay and benefits than what she was receiving at Sunoco. Thereafter, Defendants Kate Fitzpatrick and Cheryl Smith, two managerial level employees with Sunoco, gave an Axalta employee, Carrie Ruddy, false, negative and misleading, confidential information about Plaintiff—deliberately and with reckless disregard for the truth—knowing and intending that that information would cause her job offer at Axalta to be rescinded. As a result of this information, Axalta did rescind its offer of employment to Plaintiff.

Defendants denied all liability with respect to Plaintiff's claims. Defendants asserted that no evidence existed to support Plaintiff's contention that Axalta had actually offered Plaintiff a job and that, in any event, Fitzpatrick only had a personal and casual conversation about Plaintiff via text message with a friend at Axalta, Carrie Ruddy. Defendants further asserted that nothing Fitzpatrick said was intended to be used by Axalta in deciding whether to hire Plaintiff or could reasonably be construed as such. Defendants also denied that anything Fitzpatrick said to Ruddy actually had any bearing on Plaintiff's loss of a job offer from Axalta. Defendants further denied that Smith had any communications about Plaintiff to anyone at Axalta.

Arbitrator Sweeney held an evidentiary hearing on September 22-24, 2020, on the issue of liability under all four claims. On November 30, 2020, Arbitrator Sweeney issued a twenty-nine page Interim Award in which he dismissed Plaintiff's FLSA and FMLA claims but found in favor of Plaintiff on her claims against Defendants for defamation and tortious interference with a

business relationship. As part of the Interim Award, Arbitrator Sweeney awarded Plaintiff the following damages:

1) $156,501.41 in compensatory damages against Defendants jointly and severally;
2) $5,360.00 against Sunoco in attorney fees incurred by Plaintiff related to her Motion for Sanctions for spoliation of evidence; and
3) $1,127.90 in litigation costs and expenses.

[Doc. 44-2, Interim Award at Page ID # 779]. Arbitrator Sweeney stated in his decision that "[t]his award shall remain in full force and effect until such time as a Final Award is rendered." [Doc. 44-2, Interim Award at Page ID # 781].

Arbitrator Sweeney held a subsequent hearing on punitive damages on March 25, 2021. On April 29, 2021, Arbitrator Sweeney issued his Final Award, a thirty-nine page opinion in which he detailed his findings in favor of Plaintiff on her tort claims and the basis for his award of compensatory and punitive damages. The Final Award incorporated the Interim Award.[3] [Doc. 35-1, Arbitrator Sweeney's Final Award]. In the Final Award, Arbitrator Sweeney awarded to Plaintiff the following damages:

1) $156,501.41 in compensatory damages against Defendants jointly and severally;
2) $5,360.00 against Sunoco in attorney fees incurred by Plaintiff related to her Motion for Sanctions for spoliation of evidence;
3) $2,304.40 in litigation costs and expenses;
4) $2,950.00 for AAA administrative fees;
5) $41,342.50 for the Arbitrator's fee;
6) $25,000 in punitive damages each against Fitzpatrick and Smith; and
7) $450,000 in punitive damages against Sunoco.

[Doc. 35-1, Final Award, Page ID # 209].

Subsequently, Defendants filed their Motion to Vacate Arbitration Award [Doc. 34] in this Court, and Plaintiff followed with her Motion to Confirm Arbitration Award and Award Interest [Doc. 45]. Plaintiff does not contest Arbitrator Sweeney's dismissal of Plaintiff's FLSA and FMLA

---

[3] The Interim Award was amended by Case Management Order No. 21, entered February 4, 2021, by increasing the amount awarded for litigation costs and expenses to $2,304.40.

4

claims. Rather, at issue is Arbitrator Sweeney's decision finding that Defendants defamed Plaintiff and interfered with her business relationship with Axalta, and his decision awarding Plaintiff compensatory and punitive damages.

### B. Arbitrator Sweeney's Findings of Fact

The facts of this case are extensive. The Court does not attempt to detail all of the evidence in this Report and Recommendation. Such an exercise is outside the Court's scope of authority to review an arbitration decision pursuant to the Federal Arbitration Act ("FAA"). The Court will, however, detail salient findings made by Arbitrator Sweeney:

- Plaintiff was employed by Sunoco as a field recruiter from December 2015 through October 2017. In 2017, she was earning $83,200.00 per year. Plaintiff was assigned recruiting responsibilities for positions at Sunoco's retail stores in parts of Tennessee and Georgia, and Defendant Cheryl Smith was Plaintiff's direct supervisor. Kate Fitzpatrick was a Senior HR Manager for Sunoco. As a condition of Plaintiff's employment, Sunoco required Plaintiff to enter into an agreement ("Arbitration Agreement") which barred claims arising from her employment to be brought in any state or federal court against Sunoco and/or its employees; instead, the Arbitration Agreement required such claims to proceed to final and binding arbitration. [*See* Arbitration Agreement, Doc. 44-1, Page ID # 735.][4]

- In Spring 2017, it became known that Sunoco was selling to 7-Eleven the business unit in which Plaintiff worked. The affected Sunoco employees were guaranteed jobs until October 15, 2017, and would receive certain benefits, including a bonus, if they agreed to stay through that date. Plaintiff signed her transition agreement with Sunoco on August 26, 2017, and remained with Sunoco until October 15, but she did not receive a bonus because she refused to sign a release of claims against Sunoco.

- After the 7-Eleven sale was announced, Plaintiff began to look for other employment because she did not know whether 7-Eleven would hire her after the sale. In August 2017, Plaintiff was contacted by a former business colleague, Isha Patterson, the North American Human Resources Leader at Axalta. Patterson told Plaintiff about a Senior Human Resources Generalist position at Axalta's Duracoat facility in Alabama. Plaintiff interviewed with Patterson on August 20, 2017, and was given a verbal offer by Patterson for a job in Huntsville, Alabama, making $95,000 a year, a full benefits package, a $30,000 relocation package, and the immediate availability of FMLA leave. Plaintiff verbally accepted the offer and Patterson told her she would receive written

---

[4] The Employee Resolution in Action Agreement states in relevant part, "[Sunoco's] ERA is a condition of employment and by accepting employment with [Sunoco] you are knowingly and voluntarily agreeing to its terms, including the requirement that you arbitrate any claims against the Company."

5

confirmation after Patterson returned to her office in Texas. Before a written offer was extended, however, Carrie Ruddy, a former Sunoco employee who was then employed at Axalta, reached out to Fitzpatrick, her former colleague at Sunoco, seeking information about Plaintiff. Fitzpatrick and Smith then responded to Ruddy via text messages with negative information about Plaintiff which they knew to be incomplete, misleading, and false and with intent to harm Plaintiff. As a result, the Axalta offer was withdrawn, and Patterson told Plaintiff that Axalta had withdrawn the offer because of the negative information Ruddy had received about her from Fitzpatrick and Smith.

- After her offer was rescinded—and before the sale of Sunoco to 7-Eleven—Plaintiff filed an ethics complaint with Sunoco's Vice President of Human Relations, Lynn Lambrecht, stating that Fitzpatrick and Smith had conveyed negative information about her to Axalta. Sunoco instructed Fitzpatrick and Smith to search their company-issued cell phones for communications with Ruddy about Plaintiff, but only Fitzpatrick produced text messages. Smith claimed to have no messages. Because Patterson told Plaintiff about specific negative information received by Ruddy—and such negative information was not included in the text messages, nor was it admitted to by Fitzpatrick and Smith—Arbitrator Sweeney concluded that the complete text communications among Fitzpatrick, Smith, and Ruddy were not produced even though they had been requested in discovery. Further, Arbitrator Sweeney found that Sunoco did not search Fitzpatrick's and Smith's company-issued cell phones, and that Sunoco failed to take appropriate action to preserve data and communications on the cell phones. Arbitrator Sweeney did not credit Sunoco's argument that it did not have control or custody of the company-issued cell phones. He noted that Fitzpatrick and Smith were fully aware of Sunoco's policy to limit information to nothing more than position and dates of employment in response to inquiries regarding an employee. In fact, Fitzpatrick was the HR representative who taught this policy to other employees.

- Arbitrator Sweeney further found that Sunoco's investigation into Plaintiff's ethics complaint was "suspect." While Sunoco produced a "Progressive Discipline Notice" dated November 20, 2017, for Fitzpatrick, the notice was not signed by Fitzpatrick or Lambrecht, and, in derogation of Sunoco's policy, a copy was not located in Fitzpatrick's personnel file. Arbitrator Sweeney further noted that the November 2017 disciplinary notice referenced Plaintiff's lawsuit against Sunoco even though Plaintiff did not file her lawsuit until February 9, 2018. Finally, Arbitrator Sweeney noted that Sunoco had presented no evidence regarding how Sunoco conducted the ethics investigation.

- In a detailed explanation, Arbitrator Sweeney found that Fitzpatrick, Smith, Lambrecht, and Ruddy were not credible witnesses. On the other hand, he did find that Plaintiff and Patterson were credible witnesses. He concluded that Fitzpatrick and Smith had not given Ruddy information about Plaintiff in good faith; rather they had deliberately and with reckless disregard for the truth, made negative, misleading statements regarding Plaintiff knowing and intending that these statements would derail her job offer at Axalta. Further, Fitzpatrick and Smith misused and shared confidential employment information to defame Plaintiff and "their actions had only one reasonably

6

foreseeable predominant purpose . . . to injure [Claybrook] in her job prospects with Axalta." [Doc. 35-1, Arbitrator Sweeney's Final Award, Page ID # 191].

- Plaintiff's employment with Sunoco ended October 16, 2017. She began a new job as Director of Human Relations with Quantum Restaurants ("Quantum") in January 2018, making $70,000 per year. Unlike Axalta, Quantum did not give her immediate access to FMLA leave. In July 2018, Plaintiff's mother, who was in the final stages of cancer treatment, fell and broke her hip. Plaintiff asked for leave to take care of her mother, but, because she had not been with Quantum long enough to be statutorily entitled to FMLA leave, her leave request was denied. Plaintiff left Quantum to take care of her mother who died on September 18, 2018. Plaintiff was not able to return to Quantum. She was next hired by Aquarius Staffing in September of 2019.

## C.     The Arbitration Agreement

At all times relevant to this matter, Sunoco had in place an Employee Resolution in Action Program ("ERA") which provides for a series of steps an employee must follow when seeking to resolve disputes arising from the employee's employment. This process begins by requiring an employee to discuss their concerns with the employee's direct supervisor and concludes with final and binding arbitration. [Doc. 44-1]. The Arbitration Agreement incorporates the terms of the ERA, which are spelled out in the ERA Handbook. [*Id.; see also* ERA Handbook, Doc. 44-1 at Page ID ## 736-52].

Section II of the ERA Handbook sets forth the rules and procedures for the arbitration process. [*See* Section II – Rules and Procedures, *Id.* at Page ID ## 747-52]. Rule 1 in the ERA Handbook touts the benefits of the ERA Program over traditional avenues of recourse as "[a] better way to handle issues" and states "we designed the ERA Program to allow such complaints to be resolved more quickly and cost effectively than if you were to resolve them through the judicial system"). [*Id.* at Page ID # 739].[5] It also provides, "[t]hese Rule and Procedures govern arbitration

---

[5]*See also Id.* at Page ID # 747 (stating the ERA Program is designed "for the quick, fair, accessible and inexpensive resolution of issues. . . ."); *Id.* at 746 ("You can expect a quick and binding final resolution of your issue or claim (within months instead of years in the legal system) . . . You can benefit from the objectivity and experience of an external neutral arbitrator.")).

7

matters involving legal rights and apply with full force to all parties to the dispute." [*Id.* at Page ID # 747].

Rule 2 of the ERA Handbook addresses matters subject to arbitration as being:

> [A]ny and all employment-related disputes, controversies or claims arising out of, or relating to an employee's . . . employment or cessation of employment with [Sunoco which] shall be settled exclusively by final and binding arbitration before a neutral, third party arbitrator selected in accordance with these ERA Program Rules and Procedures. Arbitration shall apply to any and all such issues, controversies or claims whether asserted against [Sunoco] and/or against any employee, officer, alleged agent, director or affiliate company.
>
> All claims arising under federal, state or local statutory or common law shall be subject to arbitration. By way of example, these claims include, . . . state and local statutory or common law claims whether contract or tort . . . .

[*Id.* at Page ID # 747].

Rule 4 of the ERA Handbook addresses, among other subjects, choice of law, the arbitrator's authority to interpret the rules of arbitration, burdens of proof, and the binding nature of the arbitration:

> The arbitrator shall apply the substantive law of the state in which the employee's job was based when the facts giving rise to the claim arose, and/or federal law, as applicable to the claim(s) asserted (hereinafter referred to as the "Applicable Law of the Jurisdiction"). The arbitrator, and not any federal, state or local court, shall have exclusive authority to resolve any matter relating to the interpretation, applicability, enforceability or formation of these Rules. The aggrieved party has the burden of proving by a preponderance of the evidence, any claim asserted pursuant to this ERA Program. The arbitration shall be final and binding upon the parties for all purposes.

[*Id.* at Page ID # 749]. Rule 5 provides for reasonable discovery and gives the arbitrator the authority to decide all evidentiary matters which will be final and binding on the parties:

> The arbitrator shall decide all evidentiary matters and matters relating to discovery. Such decisions will be final and binding upon the parties. The arbitrator shall be guided by the Federal Rules of Evidence and the Federal Rules of Civil Procedure pertaining to discovery in making such determinations.

[*Id.* at Page ID # 750]. Rule 8 provides for the preclusive effect of the arbitration:

8

The ERA Program and its Rules and Procedures preclude litigation or re-litigation in any federal, state or local court by either the Company or its employees of any claim that has been, is being, will be, or could or should have been arbitrated under the ERA Program

[*Id.* at Page ID # 751]. Rule 10 provides that any award rendered pursuant to the ERA Program is enforceable under the FAA, and Rule 11 permits an appeal to the district court of the arbitrator's award in accordance with the appeal procedures of the FAA, 9 U.S.C. § 1 *et seq.* [*Id.* at Page ID # 752].

## III.    Discussion

Defendants seek vacatur of the Arbitration Award or, in the alternative, modification of the Arbitration Award, specifically, the damages award. For the reasons stated herein, the Court finds that Defendants are *not* entitled to vacatur or modification, and will instead recommend that the Plaintiff's Motion to Confirm the Arbitration Award be granted. The Court will first address the request for vacatur, then the request for modification, and, finally, the motion to confirm the arbitration award.

### A.    Defendants' Motion to Vacate the Arbitration Award

Defendants seek vacatur of the Arbitration Award on the ground that the Arbitrator acted with manifest disregard of the law by: (1) imposing sanctions against Defendants for spoliation of evidence; (2) finding Defendants liable on Plaintiff's defamation and tortious interference with a business relationship claim; (3) failing to apply to Defendants Tennessee's rebuttable presumption of good faith found in Tenn. Code Ann. § 50-1-105; and (4) awarding certain damages.

9

### 1. Standard of Review to Vacate an Arbitration Award

#### a. Overview

The purpose of the FAA is "to ensure the enforcement of arbitration agreements according to their terms so as to facilitate streamlined proceedings." *Savers Prop. And Cas. Ins. Co. v. Nat'l Union Fire Ins. Co. of Pittsburg*, 748 F.3d 708. 717 (6th Cir. 2014) (quoting *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 344 (2011). "Arbitration under the FAA is contract-driven and principally 'a matter of consent.'" *Savers*, 748 F.3d at 717 (quoting *EEOC v. Waffle House, Inc.*, 534 U.S. 279, 294 (2002)). As such, the parties may design their own arbitration processes tailored to the dispute at hand thereby reducing costs and increasing the speed of dispute resolution. *Savers*, 748 F.3d at 717.

The FAA "'expresses a presumption that arbitration awards will be confirmed.'" *Coffee Beanery, LTD. v. WW, LLC*, 300 F. App'x 415, 418 (6th Cir. 2008) (quoting *Nationwide Mut. Ins. Co. v. Home Ins. Co.*, 429 F.3d 640, 643 (6th Cir. 2005)). A court's review of an arbitrator's decision is "one of the narrowest standards of review in all of American jurisprudence." *Samaan v. Gen. Dynamics Land Syss., Inc.*, 835 F.3d 593, 600 (6th Cir. 2016) (quoting *Uhl v. Komatsu Forklift Co., Ltd.*, 512 F.3d 294, 305 (6th Cir. 2008)). "Courts must refrain from reversing an arbitrator simply because the court disagrees with the result or believes the arbitrator made a serious legal or factual error." *Samaan*, 835 F.3d at 600 (quoting *Solvay I., Inc. v. Duramed I., Inc.*, 442 F.3d 471, 476 (6th Cir. 2006) (brackets, citation, and emphasis omitted)).

The sole grounds to vacate or modify an arbitration award pursuant to the FAA are found in §§ 10 and 11 of the FAA. *Hall Street Assocs. v. Mattel. Inc.*, 552 U.S. 576, 590 (2008); *Grain Trinity Health Servs., Inc. v. Mercy Health Servs., Inc.*, 551 F.3d 374, 378 (6th Cir. 2008). "Under the terms of § 9 [of the FAA], a court 'must' confirm an arbitration award 'unless' it is vacated,

modified, or corrected 'as prescribed' in §§ 10 and 11. Section 10 lists grounds for vacating an award, while § 11 names those for modifying or correcting one." *Hall Street*, 552 U.S. at 582. The basis for vacating and the basis for modifying are different. The Court will begin with the statutory basis for vacating an award pursuant to § 10.

Under the FAA, a district court in which an arbitration award is made may, upon application, issue an order confirming the award. 9 U.S.C. § 9. In addition, upon application of any party, the district court may issue an order vacating the award for any one of the following reasons:

(1) where the award was procured by corruption, fraud, or undue means;

(2) where there was evident partiality or corruption in the arbitrators, or either of them;

(3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or

(4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

9 U.S.C. § 10(a).

Of these four bases, Defendant relies only on the fourth one, *to wit*, that the arbitrator exceeded his powers. The party seeking vacatur of an arbitration award on the ground that the arbitrator exceeded his powers bears "a very great" burden. *Federated Dep't Stores, Inc. v. J. V. B. Indus., Inc.*, 894 F.2d 862, 866 (6th Cir. 1990).

An arbitrator exceeds his powers, i.e., his scope of authority, where the arbitrator resolves a dispute the arbitration agreement did not commit to arbitration. *Bhd. Of Locomotive Eng'rs and Trainmen v. United Transp. Union*, 700 F.3d 891, 901 (6th Cir. 2012); *Truck Drivers Local No.*

11

*164 v. Allied Waste Sys., Inc.*, 512 F.3d 211, 217 (6th Cir. 2008). In this case, there is no credible assertion that Arbitrator Sweeney ruled on subjects which were not properly submitted for arbitration pursuant to the Arbitration Agreement. Rule 2 of the Arbitration Agreement gives the arbitrator authority to resolve an employee's tort claims arising from employment at Sunoco. Rule 5 of the Arbitration Agreement gives the arbitrator authority to decide all evidentiary matters and matters relating to discovery, stating such decisions are "final and binding."

An arbitrator also exceeds his power where the arbitrator has acted "with manifest disregard of the law." *In re Romanzi,* 31 F.4th 367, 375 (6th Cir. 2022) ("Section 10(a)(4) also allows an arbitration award to be vacated if it was made in "manifest disregard of the law.") Defendants seek vacatur on this particular ground.

### b. Manifest Disregard of the Law

An arbitrator acts with manifest disregard of the law if "'(1) the applicable legal principle [at issue] is clearly defined and not subject to reasonable debate; and (2) the arbitrator[ ] refused to heed that legal principle.'" *In re: Romanzi*, 31 F.4th at 375 (brackets added) (quoting *Dawahare v. Spencer*, 210 F.3d 666, 669 (6th Cir. 2000). "A mere error in interpretation or application of the law is insufficient. . . Rather, the decision must fly in the face of clearly established legal precedent." *In re: Romanzi*, 31 F.4th at 375 (quoting *Merrill Lynch, Pierce, Fenner & Smith, Inc., v. Jaros*, 70 F.3d 418, 421 (6th Cir. 1995)). "[O]utrageous circumstances" are required before a court can say an arbitrator acted with manifest disregard of the law. *In re Romanzi*, 31 F.4th at 375. "To maintain 'arbitration's essential virtue of resolving disputes straightaway,' courts may vacate an arbitration award 'only in very unusual circumstances.'" *Savers*, 748 F.3d at 717 (quoting *Oxford Health Plans, LLC v. Sutter*, 569 U.S. 564, 568 (2013)).

When defining "manifest disregard of the law," it is also important to observe what it is *not*. Manifest disregard of the law does not encompass alleged erroneous findings of fact by the arbitrator. *Samaan*, 835 F.3d at 600 ("Courts must refrain from reversing an arbitrator simply because the court disagrees with the result or believes the arbitrator made a serious legal or factual error"); *see also Allied Waste*, 512 F.3d at 217 ("We must resist the temptation to overturn an arbitration merely because, in our opinion, the arbitrator made 'serious, improvident, or silly' legal or factual errors") (quoting *Mich. Family Res., Inc. v. Serv. Employees Int'l Union Local 517M*, 475 F.3d 746, 753 (6th Cir. 2007); *Federated Dep't Stores*, 894 F.2d at 866 ("the courts are not authorized to reconsider the merits of an award even though the parties may allege that the award rests on errors of fact") (quoting *Bd. of Cnty Comm'rs v. Robert Kimball and Assocs.*, 860 F.2d 683, 685 (6th Cir. 1988). Courts will refuse to consider challenges to an arbitrator's findings of fact where a complainant has attempted to clothe those challenges under the mantle of manifest disregard of the law:

> [N]one of [Murray's] arguments derive from a law-based analysis. Rather, all of his claims—including those that he identifies as black-letter arguments—contain thinly veiled attempts to relitigate factual determinations made by the arbitration panel. *As a categorical matter, we do not engage in such exercises when reviewing an arbitration award*, regardless of whether it is explained or not.

*Murray v. Citigroup Global Markets, Inc.*, 511 F. App'x 453, 455 (6th Cir. 2013) (emphasis added). The reason for such a hardline stance is clear: "If parties could take full-bore legal and evidentiary appeals, arbitration would become merely a prelude to more cumbersome and time-consuming judicial review process." *Sutter*, 569 U.S. at 568 (internal citations omitted).

## 2. Arbitrator Sweeney did not act with manifest disregard for the law by imposing a sanction on Sunoco and Smith for spoliation of evidence.

In a twenty page opinion entered on July 29, 2021, addressing Plaintiff's Motion for Sanctions for spoliation of evidence, Arbitrator Sweeney found that Sunoco had failed to take

reasonable steps to preserve evidence on Fitzpatrick's and Smith's cellphones and that Smith had also failed to take reasonable steps to preserve the evidence on her cellphone—despite their knowledge that they had a duty to preserve such evidence.[6] [Doc. 35-8, Case Management Order No. 14 at Page ID # 597-616].

First, Defendants take issue with this finding. Defendants assert that testimony of Smith and Sunoco's IT expert, Dana Grogan, demonstrates that Sunoco acted reasonably to preserve data on the cell phones, and Arbitrator Sweeney acted with manifest disregard of the law when he failed to credit Grogan's testimony and reach this finding. [Doc. 35, Def.s' Memo. in support of Motion to Vacate, Page ID # 143]. This challenge relates to Arbitrator Sweeney' findings of fact and is not reviewable by the Court.

Second, Defendants argue that, in his Final Award, Arbitrator Sweeney imposed adverse inferences against them as sanctions for spoliation and that such inferences cannot be imposed, as a matter of law, unless there is a finding that a party *intentionally* spoliated evidence. Since Arbitrator Sweeney did not find Sunoco and Smith *intentionally* spoliated evidence, the argument continues, his imposition of adverse inferences against them for failure to preserve cellphone evidence was in manifest disregard of the law.

In his Final Award, following another evidentiary hearing, Arbitrator Sweeney *did* find that "Sunoco, intentionally, as a matter of policy or practice, failed both to search and to preserve

---

[6] In Case Management Order No. 14 on the Motion for Sanctions, Arbitrator Sweeney found Fitzpatrick's cellphone belonged to Sunoco, but that neither Sunoco or Smith presented evidence as to who owned Smith's cellphone, what kind of cellphone it was, whether Smith had been told to preserve the evidence on the cellphone, or what she did with the cellphone after the 7-Eleven sale. [Doc. 35-8, at Page ID # 611]. However, in his Final Award, following an evidentiary hearing, Arbitrator Sweeney found both cellphones were owned by Sunoco. Nevertheless, Sunoco argues that Arbitrator Sweeney should have accepted its expert's testimony that it could not legally search Fitzpatrick's and Smith's cellphones. As an aside and at the risk of dipping a toe into the forbidden pool of fact review, the Court notes that in other cases before this Court, this Court has ordered parties to turn over to a third-party electronic discovery from their employees' company-issued cellphones for forensic examinations. Further, Sunoco insisted it *did* search Fitzpatrick's cellphone which begs the question of why it could not have searched Smith's cellphone.

14

two company owned phones used by two employees identified as having improperly provided defamatory information to Axalta, causing Claimant to lose a job." [Doc. 35-1, Final Award at Page ID # 192]. Notwithstanding this finding, Arbitrator Sweeney did *not* impose an adverse inference on Sunoco and Smith for failure to preserve cellphone information; he imposed a *different* sanction:

> The sanction which has been imposed, permitting Claybrook to testify about what Ms. Patterson told her that caused Axalta to withdraw its job offer and an award of attorney's fees incident thereto, are sufficient. The Arbitrator declines to invoke an irrebuttable presumption as well. As discussed above, the evidence is sufficient without reliance on the requested inference to prove that Smith and Fitzpatrick collusively committed defamation and tortious interference injuring Claimant. There is no need to rely on an evidentiary inference.

[*Id.* at Page ID # 20]. Defendants argue that Plaintiff's testimony about what Patterson told her was the reason for the offer being withdrawn is inadmissible hearsay. Defendants further argue

> [b]y admitting Plaintiff's hearsay testimony and giving it greater weight than other non-hearsay testimony, the Arbitrator again grossly exceeded his authority. The Arbitrator improperly allowed Plaintiff to offer hearsay evidence in the form of her own, self-serving testimony about what Patterson allegedly told her caused Axalta to withdraw its job offer. [7]

[Doc. 35, Def.s' Memo at Page ID # 147]. However, Arbitrator Sweeney offered several well-reasoned bases to explain why his allowing Plaintiff's testimony concerning what Patterson told her was not improper:

First, pursuant to the Arbitration Agreement, he is not *bound* by the Federal Rules of Evidence; rather such rules are to be used for *guidance* only. [Doc. 35-8 Case Manag. Ord. No. 14 at Page ID # 613].

Second, Plaintiff's testimony could be properly admitted pursuant to Fed. R. Evid. 807, the residual exception to Rule 802's prohibition of hearsay evidence, as this testimony contained

---

[7] The Court notes that Claybrook's testimony was no more self-serving than Fitzpatrick's or Smith's testimony.

15

sufficient guarantees of trustworthiness and was more probative for the point offered that any other evidence Plaintiff could obtain through reasonable efforts. [*Id.* at Page ID # 17]. Arbitrator Sweeney carefully detailed why he found that such testimony contained guarantees of trustworthiness—a factual finding well within his scope of authority as the arbitrator.

Third, the AAA Employment Arbitration Rules do not prohibit hearsay evidence. [*Id.*]. *See* Rule 30 of the AAA Employment Arbitration Rules and Procedures ("The arbitrator shall be the judge of the relevance and materiality of the evidence offered, and conformity to legal rules of evidence shall not be necessary.")

Fourth, Tennessee common law gives courts the inherent authority to fashion appropriate sanctions where a party breaches his duty to preserve evidence—without a finding of intentional spoliation. *See Tatham v. Bridgestone Ams. Holding, Inc.*, 473 S.W. 3d 734, 745-746 (Tenn. 2015). As the Tennessee Supreme Court explained:

> Indeed, while in the past under the common law doctrine of spoliation, there clearly was a prerequisite of intentional misconduct for a trial court to impose the specific sanction of a negative inference against the spoliating party, we see no reason to continue the requirement of intentional misconduct for the imposition of sanctions for the spoliation of evidence whether the sanction be imposed under the common law doctrine, under the inherent authority of the court, . . . . We hold today that the analysis for the possible imposition of any sanction for the spoliation of evidence should be based upon a consideration of the totality of the circumstances.

In addition to the reasons Arbitrator Sweeney offered for permitting Plaintiff to testify about what Patterson told her was the reason why the offer was withdrawn, the Court also concludes that Arbitrator Sweeney's sanction was appropriate under Federal Rule of Civil Procedure 37(e)(1). Under Rule 37(e)(1), if a party fails to take reasonable steps to preserve electronically stored information, upon a finding of prejudice to another party from loss of the information, [the court] may order measures no greater that necessary to cure the prejudice. . . ." Text messages stored on the cellphones themselves are electronically stored information as much

16

as is information stored on the hard drive of a computer. Arbitrator Sweeney explained in detail why he concluded there were other text messages from Fitzpatrick and Smith to Ruddy (who conveyed information to Patterson about Plaintiff) on Fitzpatrick's and Smith's cellphones that were not produced by Defendants. [Doc. 35-8 Case Management Ord. No. 14 at Page ID # 608-614]. Arbitrator Sweeney also found Plaintiff was prejudiced because she was not able to have the cellphones forensically searched to determine what other evidence they contained and to use that information to examine Fitzpatrick, Smith, and Ruddy. Allowing Plaintiff to testify as to what Patterson said Ruddy had told her about Plaintiff was a remedy no greater than necessary to cure the prejudice. Moreover, contrary to Defendants' assertion, this solution to the loss of the cellphone information was not an adverse inference. While Arbitrator Sweeney did make a number of negative inferences about Defendants—such as that they lied about the information Fitzpatrick and Smith gave to Ruddy and for what purpose—he did so from the evidence as a whole, not as a sanction. As Arbitrator Sweeney stated in the Final Award:

> Intent is seldom capable of direct proof, and triers-of-fact lack the ability to peer into a person's mind to assess intentions or motivations. Accordingly, triers-of-fact must infer intent from the circumstantial evidence, including a person's actions or conduct. In Re Audrey S., 182 S.W.3d 838, 863-64 (Tenn. Ct. App. 2005).

[Doc. 35-1, Final Award at Page ID # 190].

In sum, this Court finds Arbitrator Sweeney's decision to permit Sunoco to testify about what Patterson told her was well reasoned and within the bounds provided by the Arbitration Agreement, Tennessee law, and the Federal Rules of Evidence. More importantly, even if Arbitrator Sweeney did make a mistake in his application of the Federal Rules of Evidence, the Arbitration Agreement, and Tennessee law, it was a "mere misapplication" and not the type of "outrageous conduct" as would constitute a manifest disregard of the law.

### 3. The Arbitrator did not act with manifest disregard of the law in finding Defendants liable on Plaintiff's claims of defamation and tortious interference with a business relationship.

The parties agree that Tennessee law applies to Plaintiff's claims of defamation and tortious interference with a business relationship. In order to prevail on her claim of defamation, Plaintiff had to prove the following:

> (1) [Defendants] published a statement; 2) with knowledge that the statement is false and defaming to the other; or 3) with reckless disregard for the truth of the statement or with negligence in failing to ascertain the truth of the statement.

*Sullivan v. Baptist Mem. Hosp.*, 995 S.W.2d 569, 571 (Tenn. 1999); *see also Brown v. Christian Bros. Univ.*, 428 S.W. 3d 38, 50 (Tenn. Ct. App. 2013). The evidentiary standard is preponderance of the evidence. *Memphis Pub. Co. v. Nichols*, 569 S.W.2d 412, 419 (Tenn. 1987); *In re Conservatorship of Turner*, No. M2013-01665-COA-R3-CV, 2014 WL 1901115, at * 8 (Tenn. Ct. App. May 9, 2014).

In order to prevail on her claim for tortious inference with a business relationship, Plaintiff had to prove by a preponderance of the evidence:

> (1) an existing business relationship with specific third parties or a prospective relationship with an identifiable class of third persons; (2) the defendant's knowledge of that relationship and not a mere awareness of the plaintiff's business dealings with others in general; (3) the defendant's intent to cause the breach or termination of the business relationship; (4) the defendant's improper motive or improper means; and finally, (5) damages resulting from the tortious interference.

*Trau-Med of Am., Inc. v. Allstate Ins. Co.*, 71 S.W.3d 691, 701 (Tenn. 2002); *see also Clear Water Partners, LLC v. Benson*, No. E2016-00442-COA-R3-CV, 2017 WL 376391, at *5 (Tenn. Ct. App. Jan. 26, 2017). Even if Arbitrator Sweeney had made serious factual errors, such errors would not be reviewable by this Court.

Defendants contend that Arbitrator Sweeney acted with manifest disregard of the law when he found Defendants liable for both tort claims. They seek to undermine virtually every factual

18

finding and credibility determination adverse to them by arguing that Arbitrator Sweeney acted

with manifest disregard of the law because the better evidence, the more direct evidence, the more

credible evidence, or the *only* evidence supports Defendants' version of events. By way of example,

Defendants assert:

- "Contrary to sworn evidence, the Arbitrator conjured the existence of phantom communications between Ruddy and Fitzpatrick" and "[c]ontrary to sworn evidence the Arbitrator also conjured phantom communications between Ruddy and Smith." [Doc. 35, Def.s' Memo. at Page ID # 147-48].

- "The Arbitrator incorrectly drew the inference that both Smith and Fitzpatrick communicated negative information about Plaintiff to Axalta." [*Id.* at Page ID # 148].

- "There was no evidence before the Arbitrator to demonstrate that Fitzpatrick acted with intent to cause harm or malice." [*Id.* at Page ID # 148].

- "The Arbitrator committed a manifest disregard of the law because there was no evidence of any defendant's intent to destroy evidence or to relay negative information to Axalta." [*Id.* at Page ID # 149].

- "In addition to admitting hearsay, the Arbitrator's finding on spoliation trickled into the Hearing in the form of prejudicial negative inferences. In the sanctions order, the Arbitrator held—without supporting evidence—that "there is ample reason to believe there were other communications between Ms. Ruddy and Sunoco about Ms. Claybrook than those contained in the produced Fitzpatrick texts." See Ex. 8, p. 19. However, this inference conflicts with the undisputed testimony that Ruddy and Fitzpatrick did not speak substantively again about Plaintiff outside of those text messages. See Ex. 2 at 835:18-20." [*Id.* at Page ID # 147].

- "[T]here was no credible evidence whatsoever to implicate Smith in the Arbitrator's ruling." [*Id.* at Page ID # 170].

- The Arbitrator greatly exceeded his powers in assuming facts that were nowhere in evidence and creating inferences that were wholly unjustified." [*Id.*].

Contrary to Defendants' assertions, Arbitrator Sweeney meticulously walked through the evidence

to find that Plaintiff had proven each element for both causes of action. [Doc. 35-1, Final Award

at Page ID # 185 -192]. Defendants are simply ignoring the arbitrator's carefully reasoned opinion.

19

In another attempt to establish a "manifest disregard" argument, Defendants assert that Arbitrator Sweeney erroneously applied Tennessee's law of defamation in finding that Fitzpatrick and Smith defamed Plaintiff by making comments to Ruddy which were, by implication, defamatory in nature. Specifically, Arbitrator Sweeney found that:

> the statements Respondents Fitzpatrick and Smith made to Ms. Ruddy about Claimant were defamatory because they implied facts that were not true. While conveying that Claybrook would not be getting a job from 7-Eleven as a part of the sale transaction, they failed to state that the buyer's decision was based on the size of her territory and not her performance. Also, when Fitzpatrick said she would not put her name behind her, it further implied Claimant was a poor employee when her Company employment review said otherwise, a fact never shared. While telling Ms. Ruddy that Claimant was negative, Fitzpatrick failed to tell Ms. Ruddy that she had very little contact with her and her opinion was based on a single incident and, even as to that incident, at trial Fitzpatrick retreated from the view that Claybrook had been negative. When Fitzpatrick said she had hired Claybrook, she implied that she was her supervisor and knew her well when she didn't and based her views on surmise. Smith bolstered that untrue negative portrayal when she reported that Claybrook's work was not timely and yet Smith was partially responsible for the situation, which she did not disclose. Fitzpatrick and Smith also failed to tell Ms. Ruddy that Claybrook's only Sunoco performance evaluation indicated she was meeting job expectations and was expected to continue to be a valuable member of the field recruiting team in 2017.

[Doc. 35-1, Final Award at Page ID # 189].

Defendants acknowledge that, in Tennessee, "general opinions are [ ] actionable defamation where the 'communicated opinion may reasonably be understood to imply the existence of undisclosed defamatory facts justifying the opinion." [Doc. 35, Def.s' Memo. at Page ID # 161]. But, argue Defendants, any opinions expressed by Fitzpatrick were *personal* opinions only, and that such personal opinions could not have been construed as a job reference or as reflecting on Plaintiff's fitness for a job at Axalta. Consequently, continues the argument, Fitzpatrick could not have defamed Plaintiff or tortiously interfered with her job offer from Axalta. Arbitrator Sweeney did not agree:

Fitzpatrick's explanation for what she told Ms. Ruddy about Claybrook and the circumstances of that exchange is nonsense. Contrary to Fitzpatrick's testimony, this two-day text exchange clearly was not merely a casual conversation among friends. Ms. Ruddy had a purpose. Claybrook was interviewing for a job where she worked and Ms. Ruddy wanted feedback about her. Fitzpatrick could have and should have deferred, both because she knew little and providing such information was against Company policy. Instead, she asked about the job and provided detailed feedback. Ms. Ruddy thanked Fitzpatrick for expressing her "concerns" about Claimant and said she would be drilled with questions at the interview. She also told Fitzpatrick she would advise her of the Company's decision.

*     *     *

Smith knew about the Fitzpatrick-Ruddy text exchange. She was in Fitzpatrick's office when the first text arrived; Fitzpatrick told her about it, although Smith testified she did not recall. Furthermore, Ms. Ruddy received and conveyed more information to Ms. Patterson than was contained in the text messages, as evidenced by Patterson's specific memory of being told by Ruddy that Claimant was not a team player, indicating there was another source of information. The Arbitrator concludes that Smith lied when she testified she had no contact with Ms. Ruddy about Claybrook.

[Doc. 35-1, Final Award at Page ID ##187-88].

Defendants' challenge to Arbitrator Sweeney's award on the two tort claims as being "in manifest disregard of the law" is a thinly veiled challenge to his factual findings. It is in no way apparent to the Court that the arbitrator made incorrect factual findings; however, assuming for purposes of argument that Arbitrator Sweeney did make erroneous factual findings—even if they were "serious, improvident, or silly" factual errors"—such errors would not create a basis for vacatur.

### 4. Arbitrator Sweeney did not act with manifest disregard of the law by finding Fitzpatrick and Smith were not entitled to the rebuttable presumption of good faith under Tenn. Code Ann. § 50-1-105.

Tennessee Code Ann. 50-1-105 provides a rebuttable presumption of good faith to an employer who provides truthful information regarding a current or former employee, as follows:

Any employer that, upon request by a prospective employer or a current or former employee, provides truthful, fair and unbiased information about a current or

21

former employee's job performance is presumed to be acting in good faith and is granted a qualified immunity for the disclosure and the consequences of the disclosure. The presumption of good faith is rebuttable upon a showing by a preponderance of the evidence that the information disclosed was:

(1) Knowingly false;
(2) Deliberately misleading;
(3) Disclosed for a malicious purpose;
(4) Disclosed in reckless disregard for its falsity or defamatory nature; or
(5) Violative of the current or former employee's civil rights pursuant to current employment discrimination laws.

Arbitrator Sweeney found Tenn. Code Ann. § 50-1-105 did not apply to bar Plaintiff's defamation and tortious interference claims because:

Respondents have failed to prove that the information was provided to Axalta in good faith and was truthful or fair. Furthermore, the evidence shows that the information intentionally given to Ms. Ruddy at Axalta was deliberately misleading and made in reckless disregard for its falsity or defamatory nature.

[Doc. 35-1, Final Award at Page ID # 186]. Defendants' assertion that Arbitrator Sweeney acted with manifest disregard of the law as to this statute is, again, a challenge to the Arbitrator's fact-finding and not reviewable by this Court.

### 5. Arbitrator Sweeney's award of damages was not made in manifest disregard of the law.

Defendants assert Arbitrator Sweeney acted with manifest disregard of the law by awarding Plaintiff $16,400.00 for loss of severance pay, $98,659.00 in backpay for the time Plaintiff was unemployed after Plaintiff left Quantum until she was hired at Aquarius Staffing, and $500,000 in punitive damages. Under Tennessee law, a plaintiff who prevails on his or her claims for defamation and for tortious interference with a business relationship is entitled to the actual damages incurred as a result of the defendant's wrongdoing. *West v. Media General Convergence, Inc.*, 53 S.W. 3d 640, 648 (Tenn. 2001) (defamation); *Memphis Publishing, Inc. v. Nichols*, 569 S.W.2d 412, 419 (Tenn. 1978) (defamation). In this regard, damages for tortious conduct are

guided by the overarching principle that "[a] plaintiff may be compensated for any economic or pecuniary losses that naturally result from the defendant's wrongful conduct." *Meals ex rel. Meals v. Ford Motor Co.*, 417 S.W.3d 414, 419 (Tenn. 2013) (citing *Inland Container Corp. v. March*, 529 S.W.2d 43, 44 (Tenn.1975)).

### a. Severance Pay in the Amount of $16,400.00

Arbitrator Sweeney awarded Plaintiff the $16,400.00 she would have received had she signed the severance agreement which included a waiver of all claims. In the instant case, Defendants assert Arbitrator Sweeney acted with manifest disregard of the law when he made that award because, under well-settled principles of contract law, Plaintiff was not entitled to the benefits of the severance agreement since she was unwilling to agree to all of its terms.

If Plaintiff were proceeding under a breach of contract claim, the Court would agree with Defendants. But she was not. The $16,400.00 in compensatory damages were awarded as damages for Defendants' tortious conduct. Arbitrator Sweeney found the following:

- In August of 2017, Sunoco announced that it was selling numerous stores in the southeastern part of the country to 7-Eleven in mid-October 2017.

- In order to incentivize Sunoco employees to stay with Sunoco until the sale, Sunoco promised all employees who were to be affected by the sale that if they stayed with Sunoco until the sale, they would receive a severance package.

- After Sunoco made the announcement, Axalta gave a job offer to Plaintiff. Defendants then engaged in tortious conduct causing Axalta's job offer to be withdrawn.

- Afterwards, Plaintiff, who remained at Sunoco until the sale occurred, was denied severance pay because she would not sign the waiver due to Defendants' intervening tortious conduct.

In other words, Arbitrator Sweeney could and did find that Plaintiff's loss of severance pay constituted an actual economic loss naturally resulting from Defendants' wrongful conduct. And, as such, this economic loss was properly awarded as damages to Plaintiff pursuant to Tennessee

23

tort law. Further, even if the Court were to conclude that Arbitrator Sweeney made a mistake in the application of Tennessee law, the Court does not find that such mistake amounted to a manifest disregard of Tennessee law.

### b. Backpay in the Amount of $98,659.00

As part of Plaintiff's damages for Defendants' tortious conduct, Arbitrator Sweeney determined that Plaintiff was entitled to backpay for the period of time after she left Quantum until she was hired by Aquarius Staffing. That amount was $98,659.00. Specifically, Arbitrator Sweeney found that, after Plaintiff was employed at Quantum, her mother, who was in final stages of cancer treatment, fell and broke her hip. Plaintiff asked Quantum for leave to take care of her mother; however, she had not been at Quantum long enough to have a statutory right to FMLA leave, and Quantum had not given her immediate access to FMLA-type leave as one of the benefits of her job. Quantum therefore denied Plaintiff's leave request. The arbitrator found that, had Plaintiff been hired by Axalta, she would have eligible for the FMLA-type leave offered as part of Axalta's benefits package, and Plaintiff would have been able to take leave to care for her mother without losing her job. Because Plaintiff was not eligible for leave in her job at Quantum, she was compelled to resign so that she could care for her terminally ill mother. Given these circumstances, Arbitrator Sweeney found that Plaintiff did not voluntarily resign, and he awarded Plaintiff backpay from the time she left Quantum until she began employment at Aquarius Staffing.

Defendants contend that Plaintiff *did* voluntarily resign from Quantum and, therefore, as a matter of law, she was not entitled to backpay from that point onward because she failed to mitigate her damages. Therefore, the argument continues, Arbitrator Sweeney's award of $98,659.00 in backpay was made in manifest disregard of the law. Defendants rely on cases

brought under state and federal employment law statutes; however, those statutes are not at issue in this case. Tennessee's common law of torts controls this damages issue.

Under Tennessee common law, the party injured by the tortious conduct of another has the duty to mitigate damages; however, Tennessee common law applies an "exercise-of-reasonable-care" standard to this duty to mitigate which includes an exception for "unduly burdensome" mitigation:

> As a general rule, "one who is injured by the wrongful or negligent act of another, whether by tort or breach of contract, is bound to exercise reasonable care and diligence to avoid loss or to minimize or lessen the resulting damage, and to the extent that his damages are the result of his active and unreasonable enhancement thereof, or due to his failure to exercise such care and diligence, he cannot recover." *Cook & Nichols*, 480 S.W.2d at 545. A critical factor in judging the fulfillment of a party's duty to mitigate is whether the method employed to avoid consequential damages was reasonable under the circumstances. *Tampa Elec. Co. v. Nashville Coal Co.*, 214 F. Supp. 647, 652 (M.D.Tenn.1963). However, *an injured party is excused from a duty to mitigate damages where such a duty would be "unduly burdensome or impossible.*" *Cummins v. Brodie*, 667 S.W.2d 759, 766 (Tenn.Ct.App.1983); *Haynes*, 546 S.W.2d at 234.

*Montepeque v. Adevai*, No. E200901871COAR3CV, 2010 WL 3025541, at *11 (Tenn. Ct. App. Aug. 4, 2010) (emphasis added); *see also Cummins v. Brodie*, 667 S.W.2d 759, 766 (Tenn. Ct. App., 1983) ("The standard for mitigation of damages is reasonable care; mitigation is not required if it is unduly burdensome or impossible") (citing *Haynes v. Cumberland Builders, Inc.,* 546 S.W.2d 228 (Tenn.App.1976)).

Defendants argue Plaintiff failed to mitigate her damages when she left Quantum to care for her mother. But, as Arbitrator Sweeney found, Plaintiff found herself working at Quantum rather than Axalta because of Defendants' wrongdoing. Absent Defendants' misconduct, Plaintiff would have been hired by Axalta and would have been eligible for FMLA-type leave so that she could have taken care of her mother when the need arose. Because of Defendants' misconduct, the job offer at Axalta was withdrawn, and, while Plaintiff attempted to mitigate her losses by going

to work for Quantum, that company's benefits package did not include FMLA-type leave, so Plaintiff was forced to resign her job so that she could take care of her mother.

The question before Arbitrator Sweeney was whether Plaintiff unreasonably enhanced her damages by leaving her job at Quantum to care for her terminally ill mother. Arbitrator Sweeney concluded that she did not. He found that Plaintiff's loss of income from the time of Plaintiff's resignation from Quantum to her employment with Aquarius Staffing was a natural consequence of Defendants' tortious conduct. Different judges and arbitrators might reach different conclusions on this issue; however, the Court finds that Arbitrator Sweeney did not act with manifest disregard of Tennessee common law by awarding Plaintiff $98,659.00 in backpay.

### c. Punitive Damages

Defendants contend Arbitrator Sweeney acted with manifest disregard of the law in awarding punitive damages against Defendants because the evidence did not support an award of punitive damages, or, in the alternative, the punitive damages awarded were grossly excessive.

Arbitrator Sweeney correctly stated the law of punitive damages in Tennessee, *to wit*, punitive damages are only available in the most egregious cases and only if the aggrieved party proves by clear and convincing evidence that the tortfeasor acted either intentionally, fraudulently, maliciously, or recklessly. [Doc. 35-1, Final Award at Page ID # 21].[8] *See Cambio Health Sols., LLC v. Reardon*, 213 S.W.3d 785, 792 (Tenn. 2006); *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 (Tenn.1996). Defendants assert there was "no proof that defendants acted with *actual malice*

---

[8] Defendants contend that that Arbitrator Sweeney must have found that Defendants acted with "actual malice" to award punitive damages for defamation in this case and that there was no evidence or insufficient evidence to support such a finding. [Doc. 35, Defs' Memo. at Page ID # 155]. "Actual malice" is a term used in a defamation action if the party alleging she was defamed is a public figure or the matter at issue involves a matter of public concern; it is an element of the cause of action of defamation in such cases. *See Press, Inc. v. Verran*, 569 S.W.2d 435 (Tenn. 1978);*Charles v. McQueen*, No. M2021-00878-COA-R3-CV, slip op., 2022 WL 4490980, at *1 (Tenn. Ct. App. Sept. 28, 2022); *see also Hibdon v. Grabowski*, 195 S.W.3d 48, 58 (Tenn. Ct. App. 2005). There is no contention that Plaintiff was a public figure or that this case involves a matter of public concern, so Defendants' argument has no application to this case.

or intentionality," and, therefore, Arbitrator Sweeney's finding that Plaintiff was entitled to punitive damages was a "gross abuse of his authority." [Doc. 35, Defs. Memo. At Page ID # 156 - 57 (emphasis original)]. Arbitrator Sweeney explained in detail in the Final Award why he found by clear and convincing evidence that each Defendant intentionally and recklessly defamed Plaintiff and interfered with her job offer from Axalta. [Doc. 31-1, Final Award at Page ID ##194-97]. Defendants' challenge is a challenge to Arbitrator Sweeney's findings of fact and, consequently, falls outside the Court's scope of authority to review the Arbitration Award.

Defendants also complain that the amount of punitive damages awarded was "grossly out of line with comparable cases in Tennessee" and, therefore, made in manifest disregard of the law. [*Id.* at Page ID # 157-58]. Tenn. Code Ann. § 29-39-104(a)(4) requires the consideration of a number of factors in determining the *amount* of punitive damages to be awarded. Again, Arbitrator Sweeney meticulously explained his reasons for the award, discussing 26 factors and the extent to which each factor applied and its bearing on the amount of punitive damages. [*Id.* at Page ID ## 198 -204]. Arbitrator Sweeney then awarded punitive damages on the basis of these factors, including each Defendant's degree of culpability, the degree of harm done to Plaintiff, and each Defendant's ability to pay punitive damages.

In support of their argument that Arbitrator Sweeney acted with manifest disregard of the law, Defendants have cited several case where the punitive damages awarded were four to twelve times less than those awarded by Arbitrator Sweeney in cases involving "comparable" conduct. [Doc. 35, Def.s' Memo. at Page ID # 157-159]. On the other hand, Plaintiff cites to a number of Tennessee cases in which punitive damages were significantly greater than those imposed in this case for "comparable" conduct. [Doc. 46, Pl.'s Response at Page ID # 859-860]. But the issue before the Court is not whether different courts have awarded greater or lesser amounts of punitive

damages for similar conduct. The issue before the Court is whether the amount of Arbitrator Sweeney's punitive award was so outrageous as to constitute a manifest disregard of Tennessee common law. The Court finds that the punitive damages award does not represent a manifest disregard for Tennessee common law. To the contrary, the evidence relied upon by the arbitrator lends support to his decision.

As previously noted, Arbitrator Sweeney explained in detail how he arrived at punitive damages and the amount he determined to be appropriate. Further, Arbitrator Sweeney's punitive damages award totaling $500,000 falls within Tennessee's own cap on punitive damages found at Tenn. Code Ann. § 29-39-104(a)(5). This section limits punitive damages to twice the amount of compensatory damages awarded or $500,000.00—whichever is greater.[9] For all the reasons stated herein, the Court finds Arbitrator Sweeney' award of punitive damages was not made in manifest disregard of the law.

**B.    Defendants' Motion to Modify the Award**

As previously stated, § 11 provides the sole basis under the FAA for the modification of an arbitration award. *Hall Street*, 552 U.S. at 590. A corollary to this rule is that a court cannot modify an award of damages on the basis that the award was made in manifest disregard of the law. *Grain v. Trinity Health, Mercy Health Servs., Inc.*, 551 F.3d 374, 380 (6th Cir. 2008). As the Sixth Circuit explained,

> [W]e have used the "manifest disregard" standard only to *vacate* arbitration awards, not to *modify* them. As we held in *NCR Corp. v. Sac–Co, Inc.*, "[a] court's power to modify an arbitration award is confined to the grounds specified in [FAA] § 11," 43 F.3d 1076, 1080 (6th Cir. 1995), which do not include "manifest disregard of law. . . . *NCR* remains the law of this circuit and prohibits modifying an award based on an alleged "manifest disregard" of law.

---

[9] Tenn. Code Ann. § 29-39-104(a)(5) states:
    (5) Punitive or exemplary damages shall not exceed an amount equal to the greater of:
    (A) Two (2) times the total amount of compensatory damages awarded; or
    (B) Five hundred thousand dollars ($500,000).

*Gains*, 551 F.3d at 380 (emphasis added); *see also e.g., J.J.B. Hilliard, W.L. Lyons, LLC v. Reisen*, No. 1:09-cv-535, 2010 WL 793850, at *3 (S.D. Ohio Mar. 2, 2010) ("the manifest disregard theory authorizes a Court to vacate, but not to modify, an arbitration award"). With this understanding in mind, the Court turns to § 11 of the FAA.

Section 11 provides in relevant part:

> (a) Where there was an evident material miscalculation of figures or an evident material mistake in the description of any person, thing, or property referred to in the award.
> (b) Where the arbitrators have awarded upon a matter not submitted to them, unless it is a matter not affecting the merits of the decision upon the matter submitted.
> (c) Where the award is imperfect in matter of form not affecting the merits of the controversy.

9 U.S.C. § 11. "[A]n evident . . . miscalculation of figures concerns a computational error in determining the total amount of an award—what the Fourth Circuit calls a mathematical error appear[ing] on the face of the award." *Grain Trinity Health Servs., Inc. v. Mercy Health Servs., Inc.*, 551 F.3d 374, 378 (6th Cir. 2008). It is "an obvious numerical gaffe in computing the total award." *Id.* Further, "an award that is 'imperfect in matter of form,' as these terms suggest, is one that suffers from a scrivener's error or that otherwise does not deliver on the arbitrator's stated purpose in granting relief." *Id.* at 379.

Defendants have not argued that Arbitrator Sweeney made a mere computational or mathematical error in damages, that he made an award on matters not before him, or that the award contains a scrivener's error. Consequently, Defendants have presented no basis for the Court to modify the award.

29

## C. Plaintiff's Motion to Affirm the Arbitration Award

Pursuant to § 9 of the Federal Arbitration Act, a party to an arbitration may apply to the district court within which an arbitration award was made for an order confirming the award, and upon such application, the court "must grant such an order unless the award is vacated, modified, or corrected as prescribed in sections 10 and 11." 9 U.S.C. § 9. In the instant case, because this Court finds no basis to grant Defendants' motion to vacate or modify the Arbitration Award, the Court will recommend that the Arbitration Award be confirmed.

In addition to requesting that the Arbitration Award be affirmed, Plaintiff asks the Court to award (1) post-award, prejudgment interest and (2) post-judgment interest. "A district court confirming an arbitration award has discretion to include post-award, prejudgment interest." *The Krystal Co. v. Caldwell*, No. 1:11-cv-81, 2012 WL 876793, at *10 (E.D. Tenn. Mar. 13, 2012) (Collier, J.) (citing *Dealer Computer Servs., Inc. v. Dale Spradley Motors, Inc.*, No. 11–11853, 2012 WL 72284, at *6 (E.D. Mich. Jan.10, 2012)). The purpose of prejudgment interest is to make whole the injured party; and the injured party should not be penalized for delays in the judicial process. *Krystal*, 2012 WL 876793, at *10.

The parties are in agreement that, if the Court confirms the Arbitration Award, state law applies in awarding prejudgment interest since the basis for this Court's subject matter jurisdiction is diversity jurisdiction under 28 U.S.C. § 1332. In Tennessee, "Prejudgment interest, i.e., interest as an element of, or in the nature of, damages, . . . may be awarded by courts . . . in accordance with the principles of equity at any rate not in excess of a maximum effective rate of ten percent (10%) per annum." Tenn. Code Ann. § 47-14-123.

In the instant case, Plaintiff argues prejudgment interest should begin to accrue on all damages awarded in the Interim Award on the date the Interim Award was entered, November 30,

2020. Those damages were $156,501.41 in compensatory damages, $5,360.00 in attorney fees, and $1,127.90 in litigation costs. Plaintiff also argues that Tennessee's *post-judgment* interest rate should *guide* the Court in assessing a rate for *prejudgment* interest. Defendants assert if prejudgment interest is awarded, it should not begin accruing until the Final Award was entered on April 29, 2021. Defendants do not suggest a rate for prejudgment interest. The parties agree that, assuming this Court confirms the Arbitration Award, post-judgment interest should be awarded pursuant to 28 U.S.C. § 1961.

The Court finds prejudgment interest is appropriate to make Plaintiff whole and to ensure that she is not penalized by the Court's delay in entering a judgment in this matter. In determining when prejudgment interest should begin to accrue and at what rate, the Court looks to *Krystal Co. v. Caldwell*. In *Krystal*, the arbitrator entered an interim award finding Krystal unlawfully discharged the plaintiff for engaging in protected activity in violation of Title VII of the Civil Rights Act of 1964. The arbitrator also awarded compensatory damages. Three months later, the arbitrator entered his final award which fully incorporated the interim award. Judge Collier found that prejudgment interest began to accrue on compensatory damages on the date of the interim award because the interim award was "essentially final" except for a "few administrative issues such as attorney's fees and costs." *Krystal*, 2012 WL 876793, at *12. Similarly, as to Plaintiff's claims for defamation and tortious interference and the compensatory damages awarded pursuant to these claims, the Interim Award was final. It was also final as to the attorney fees awarded to Plaintiff in connection with her Motion for Sanctions for spoliation of evidence. Accordingly, the Court will recommend that prejudgment interest on the award of compensatory damages and attorney fees should begin to accrue on November 30, 2020. However, since litigation costs and expenses were yet to be finalized as of the date the Interim Award was entered, the Court will

recommend that interest on such expenses and costs accrue as of the date the Final Award was entered.

As to the rate of prejudgment interest, under Tennessee law, the Court may award up to ten percent per annum. Tenn. Code Ann. § 47-14-123. In *Krystal Co. v. Caldwell*, the court declined to award prejudgment interest at 10 percent pursuant to Tenn. Code Ann. § 47-14-123, finding such a rate would be a windfall to the plaintiff. 2012 WL 876793, at *11. Instead, the court used 28 U.S.C. § 1961 addressing post-judgment interest as a guide to determine a fair prejudgment interest rate to apply. *Id.* The average rate from November 30, 2020, until today was 6.2 percent, a rate the Court finds to be reasonable and fair, neither miserly nor a windfall to the Plaintiff. [10] Accordingly, the Court will recommend that post-award, prejudgment interest accrue at 6.2 percent per annum and that post-judgment interest be awarded as of entry of judgment by this Court pursuant to 28 U.S.C. § 1961.

## IV. Conclusion

Sunoco required Plaintiff and its other employees, as a condition of their employment, to agree to final and binding arbitration of any claims against it and other Sunoco employees arising from their employment. As Sunoco undoubtedly knew when requiring its employees to agree to this condition, this Court's scope of authority to review an Arbitrator's decision is extremely limited. While Plaintiff initially filed a claim in federal court, Sunoco held Plaintiff to the Arbitration Agreement, and the parties stipulated to dismissal of Plaintiff's claims in order to arbitrate. After an arbitration proceeding, the arbitrator rendered a decision unfavorable to Defendants, and Defendants now ask the Court to vacate or modify the arbitrator's decision. The Court finds that there is no basis for the relief requested by the Defendants.

---

[10] The rates for post-judgment interest in Tennessee are posted at: https://www.tncourts.gov/node/1232344.

For the reasons stated herein, it is **RECOMMENDED**[11] that:

1. Defendants' Motion to Vacate or Modify the Award [Doc. 34] be **DENIED**;

2. Plaintiff's Motion to Confirm the Award [Doc. 45] be **GRANTED**;

3. Final judgment be entered in favor of Plaintiff Shara Claybrook on her claims for defamation and tortious interference of a business relationship against Defendants, and that the following damages be awarded:

   a. $156,501.41 in compensatory damages against Defendants jointly and severally;
   b. $5,360.00 against Sunoco in attorney fees incurred by Plaintiff related to her Motion for Sanctions for spoliation of evidence;
   c. $2,304.40 in litigation costs and expenses;
   d. $2,950.00 for AAA administrative fees;
   e. $41,342.50 for the Arbitrator's fee;
   f. $25,000 in punitive damages against Defendant M. Kate Fitzpatrick;
   g. $25,000 in punitive damages against Defendant Cheryl A. Smith;
   h. $450,000 in punitive damages against Defendant Sunoco.

4. For Damage Items a. and b. above, the Court recommends prejudgment interest applied at 6.2 percent per annum to accrue from November 30, 2020, until entry of judgment.

5. For Damage Items c., d., e., f., g., and h. above, the Court recommends prejudgment interest applied at 6.2 percent per annum to accrue from April 29, 2021, until entry of judgment.

6. It is further recommended that post-judgment interest as to all damages shall accrue as of the date of judgment at the rate prescribed by 28 U.S.C. § 1961.

**ENTER.**

/s/ *Christopher H. Steger*
UNITED STATES MAGISTRATE JUDGE

---

[11] Any objections to this Report and Recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Such objections must conform to the requirements of Rule 72(b) of the Federal Rules of Civil Procedure. Failure to file objections within the time specified constitutes a forfeiture of the right to appeal the District Court's order. *Thomas v. Arn*, 474 U.S. 140, 88 L.Ed.2d 435, 106 S. Ct. 466 (1985). The district court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive or general. *Mira v. Marshall*, 806 F.2d 636 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Federation of Teachers*, 829 F.2d 1370 (6th Cir. 1987).